# EXHIBIT A

**The Washington Trust Company**
**23 Broad Street**
**Westerly, Rhode Island 02891**

## EQUITY CREDIT LINE AGREEMENT
(including Truth-In-Lending Disclosures)

Approved Credit Line: $50,000.00
Linked Checking Account: CHECKS ONLY

Date: March 9, 2001

This Agreement governs your Equity Credit Line Account ("Account") with The Washington Trust Company ("WTC," the "Bank," "we," or "us"). Each person who signs this Agreement ("you") agrees to be bound by all of its terms and conditions

YOUR CREDIT LINE. The maximum amount of principal that you can owe us from time to time on this Account is the Approved Credit Line disclosed above (your "credit line"). We may decrease your credit line under certain circumstances, as described in the section of this Agreement entitled "Reduction or Suspension of Credit Privileges."

You promise never to request a loan that, if made by us, would cause the unpaid principal balance of your account to exceed your credit line. If you do request a loan that would exceed your credit line, we have no obligation to make it, nor are we obligated to pay any draft that is postdated or more than 6 months old. However, we may do so if we so choose. You agree to repay any amount in excess of your credit line immediately and without demand from us.

HOW TO BORROW MONEY. After the third (3rd) business day following the date of this Agreement and until the end of the 118th month anniversary of this Agreement (this is called the "Draw Period"), we are obligated to loan you money as described provided that: (a) this Agreement has not been rescinded and we have received confirmation from you that you did not rescind the Agreement; (b) your Account has not been closed in accordance with the section of this Agreement entitled "Closing Your Account"; (c) we have not asked you to pay the outstanding balance of your Account in accordance with the section of this Agreement entitled "Entire Balance Due"; and (d) your right to obtain additional loan advances has not been suspended in accordance with the section of this Agreement entitled "Reduction or Suspension of Credit Privileges." The ways we are obligated to loan you money are:

1. Equity Credit Line Instruments - upon proper presentment to us of one of the Equity Credit Line instruments we have given you, which has been signed by any one of you, we will loan you the amount of the instrument: Equity Credit Line instruments look like and are processed like checks.

2. Telephone Transfer Request: - upon receipt of verbal instructions (via telephone or otherwise) that we reasonably believe are given by you, we will transfer the amount requested to the WTC checking account you have previously designated for receipt of such transfers. You must notify us within 60 days after we send you a periodic statement on which such an advance is itemized if you believe that such advance was not authorized by you.

3. Other - We may, from time to time, authorize the use of other instruments or means by which you can obtain a loan.

We will not accept stop payment orders with respect to Equity Credit Line instruments or Telephone Transfer Requests. Therefore, you should not request an advance on this Account unless you are certain that you will not need to stop payment.

YOUR PAYMENT PROMISE. You promise to pay us all amounts that you borrow under this Agreement plus the applicable finance charge and other charges as provided for in this Agreement. You also waive demand, presentment for payment, protest, notice of protest, and all other demands and notices in connection with the delivery, acceptance, performance, and default of this Agreement, and generally all defenses that you are not primarily liable.

FINANCE CHARGE. The finance charge accrues on each advance from the date of the advance until the date payment of the advance is credited.

The finance charge is computed using the daily balance method. We determine the daily balance of your Account at the end of each day by taking the beginning balance of your Account that day, and adding any Equity Credit fees. Line advances and subtracting the principal portion of any payments or credits posted to your Account that day. When we calculate the beginning balance of your Account each day, we exclude all finance charge, late charges, and annual fees.

We calculate the FINANCE CHARGE by multiplying each daily balance of your account by a daily periodic rate of 0.0236 % ANNUAL PERCENTAGE RATE 8.50% subject to adjustment as provided below. The sum of these calculations for all of the days during the billing period is your finance charge for that billing cycle

ANNUAL PERCENTAGE RATE ADJUSTMENTS. The annual percentage rate shall be adjusted on the first day of each billing cycle to a rate that is 0.00 percentage points (the "margin") Above the highest rate published in The Wall Street Journal, or any successor thereto, and designated as the "U.S. Prime Rate" on the last business day of the immediately preceding calendar month. The daily periodic rate shall be determined by dividing the adjusted annual percentage rate by 360, and then by rounding that number to four decimal places.

The rates determined in accordance with the preceding paragraph shall remain in effect until the first day of the next billing cycle, when they will be adjusted again. Any increase in the annual percentage rate will cause an increase in the amount of your monthly payments. The ANNUAL PERCENTAGE RATE will never be increased above the rate of 18% per year or the maximum rate permitted by law, whichever is lower. The annual percentage rate reflects the amount of interest (or "finance charge") that will accrue on your Account, but does not include any other costs.

If The Wall Street Journal, or any successor thereto, shall cease to publish the U.S. Prime Rate, we may use any other index rate and margin we reasonably select, provided that (i) the new index has an historical movement substantially similar to the original index and (ii) at the time of substitution, the sum of the new margin plus the new index is substantially similar to the sum of the last available value for the original index plus the original margin.

LATE FEE. If we do not receive a required payment within 15 days of its due date, we will charge you a late fee equal to 5% of the overdue payment.

ANNUAL FEE. At the time of opening your Account and on or about the anniversary of your Account each year during the Draw Period, an annual fee of $50.00 will be charged to your Account.

ACCOUNT CLOSURE FEE

xxx You will be charged an Account Closure Fee equal to:

0.50 % of the approved credit line or $295.00 whichever is greater, if you close your Account within 1 year of the date of this Agreement or
n/a % of the approved credit line or N/A whichever is greater, if you close your Account more than 1 year but less than 2 years after the date of this Agreement.

OTHER CHARGES. You will be charged the following fees in connection with opening this Account:

| | | |
|---|---|---|
| Property Appraisal: | $225.00 | Waived |
| Attorney's Fee: | $125.00 | Waived |
| Mortgage Recording Fee: | $33.00 | Waived |
| Title Examination: | N/A | |
| Title Insurance Premium: | N/A | |
| Flood Zone Determination Fee: | $15.00 | Waived |
| Other: Discharge | $12.00 | Waived |

You will also be charged our usual insufficient funds charge whenever we receive a draft of yours that we do not pay because you are no longer entitled to receive advances from your Account or because it would cause your Account balance to exceed your credit line. You will also be charged our usual returned check charge if you submit an instrument that is intended to constitute payment on your Account but that is returned unpaid for any reason. All "other charges" posted to your Account will be treated as advances from your Account.

STATEMENTS. Each month we will mail you a statement that will show (1) advances, charges, payments, and credits posted to your Account during the billing cycle, (2) what you owe us as of the statement date (your "New Balance"), and (3) the amount of your minimum payment and when it is due (the "minimum payment due date").

MINIMUM PAYMENT. Each month, you must pay us by the minimum payment due date at least the minimum payment shown on your statement. During the Draw Period, your minimum payment will be (check initial choice):

X Interest Only: the sum of (1) the finance charge for the billing cycle, plus (2) any late charges and annual fees assessed to the Account during the billing cycle plus (3) any overdue payment

____ Interest Plus Principal: the sum of (1) $50 or 1.5% of the unpaid balance of loan advances and finance charge, whichever is greater, plus (2) any late charges and annual fees assessed to the Account during the billing cycle plus (3) any overdue payment.

At any time during the Draw Period, you may elect to change your payment option from Interest Only to Interest Plus Principal or vice versa, provided that you do not make more than one change in any 12-month period. To make a change, you must give the Bank written notice in a form acceptable to the Bank.

Commencing with the first payment due after the end of the Draw Period, the minimum payment for each billing cycle during the next 10 years (this is called the "Repayment Period") will be the sum of (1) 1/120th of the New Balance as of the end of the Draw Period plus (2) all of the finance charge for the billing cycle plus (3) any late charges assessed to the Account during the billing cycle plus (4) any overdue payment. Any outstanding balance of your Account must be paid in full at the end of the Repayment Period.

You may, of course, pay more than the minimum payment amount to reduce the future finance charge.

You must make payments by mail or telephone transfer or in person at our offices. You may not use an Equity Credit Line loan to make the payment.

Payments will be applied, first, to any amount that has been itemized on a periodic statement (including finance charge, loan advances (including other charges posted to your Account), annual fees, and late charges, in that order) and then to amounts that have been posted to your Account but for which you have not yet been billed (including loan advances, finance charge, annual fees, and late charges, in that order).

We may accept late or partial payment, or checks marked "payment in full" or the like, without losing any of our rights under this Agreement. We may extend the time for any payment or delay enforcing our rights under this Agreement without losing them. If this is a joint account, we may deal with, grant extensions of time or other indulgences to, or release either one of you without affecting the liability of the other, who shall remain fully liable.

SECURITY. Your Equity Credit Line Account is secured by a mortgage on the real estate located at: 24 Seaside Drive, Jamestown, RI 02835 (the "mortgaged property")
You promise never to obtain a loan from the holder of any prior mortgage that would cause the amount of the obligation secured by that mortgage to be increased above the outstanding amount of that obligation on the date of this Agreement. You also promise to meet your obligations under the mortgage you granted to us and not to transfer all or any part of your interest in the mortgaged property to any third party.

INSURANCE. You must obtain property insurance covering the mortgaged property from an insurer of your choice who is acceptable to us.

NEGATIVE AMORTIZATION. If you have elected the "Interest Plus Principal" payment option and the annual percentage rate in effect for your Account is at or near the maximum rate, your payments during the draw period will not cover the finance charge that accrues in certain months and negative amortization will occur during those months. Negative amortization will increase the amount that you owe us and reduce your equity in your home.

TAX IMPLICATIONS: You should consult a tax advisor regarding the deductibility of interest and other charges paid in connection with this Account.

PARTIES LIABLE. Each person who signs this Agreement is legally responsible for the payment of the total amount owed on this Account, regardless of which person requested advances or incurred charges.

REDUCTION OR SUSPENSION OF CREDIT PRIVILEGES. We may reduce your credit limit or refuse to make any additional loan advances to you if:

- the value of the mortgaged property declines significantly below the appraised value on which we relied in determining your credit line;
- we reasonably believe that you will be unable to repay your credit line as required pursuant to this Agreement as a result of a material change in your financial circumstances;
- you are in default of any material obligation under this Agreement;
- we are unable to impose the annual percentage rate provided for under this Agreement as the result of some government action;
- our interest in the mortgaged property is adversely affected by some government action to such an extent that the value of the property available to satisfy your obligations under this Agreement is equal to less than 120% of your credit line;
- we have been notified by a government authority that it would be an unsafe business practice to continue making advances; or
- the maximum annual percentage rate permissible under this Agreement has been reached.

We will reinstate your original credit limit and/or your right to receive additional loan advances if you request us to do so and the event or condition that caused us to institute the reduction or suspension of credit privileges is no longer in effect.

CLOSING YOUR ACCOUNT. Any one of you has the right at any time to request in writing that we not make any future loans. Upon receipt of your request, we will make a reasonable effort to stop further advances, but, except as required by law, will not be liable for our failure to do so. You also have the right to close your Account entirely if it has a zero balance and there are no amounts remaining unpaid by delivering to us a written request. Any request or notice from you will not be effective until we receive it.

ENTIRE BALANCE DUE. If you are in default, we can declare the entire balance of your Account due and payable at once (or after any grace period required by applicable law) without notice or demand. You will be in default if you fail to make any payment when due under this Agreement. You will be in default if you commit fraud or make any material misrepresentations in connection with your Account. You will also be in default if you act or fail to act in any manner that adversely affects the property securing this Agreement or any of our rights in that property.

If your obligation to pay the entire balance is accelerated for any reason, our obligation to make additional loans to you under this Agreement ends. Your obligation to repay amounts you owe under this Agreement continues.

SET-OFF. We have a right of set-off if you are in default. Having a right of set-off means we can, but do not have to, apply any balance in any account you maintain with us to reduce or extinguish your debt. We have this right regardless of the value of the mortgaged property securing this Account.

WAIVER. If we waive enforcement of any of our rights on one occasion, that does not mean we will waive enforcement of that or any other right on any other occasion.

COLLECTION. If we incur expenses (including, without limitation, court costs and reasonable lawyers' fees) in attempting to collect any amount owed by you under this Agreement, you agree to pay us those expenses to the extent permitted by law.

AMENDMENTS. We may amend this Agreement to make any change (i) to which you specifically agree in writing at the time; (ii) that will unequivocally benefit you throughout the remaining term of this Agreement; or (iii) that is insignificant. If we amend this Agreement as permitted under clause (ii) or (iii) of the preceding sentence, we will mail a written notice of the change to you at least 15 days prior to the date on which the change is to become effective or such longer period as may be required by applicable law. Any amendment made in accordance with this provision shall apply to debts then owing and thereafter incurred by you, unless a different application is specifically provided.

TERM OF THIS AGREEMENT. This Agreement remains in full force and effect, unless your Account is sooner closed as provided in the section entitled "Closing Your Account," until the first (1st) day on which there is no outstanding balance due and owing after the end of the Draw Period or after we have accelerated your obligation as provided in the section of this Agreement entitled "Entire Balance Due." You understand that you may not obtain any new advances after the end of the Draw Period or after your Account has been closed or after we have suspended your right to receive advances as provided in the section entitled "Reduction or Suspension of Credit Privileges."

WHAT LAW APPLIES. This Agreement, and the location for bringing any action concerning this Agreement, is governed by the laws of the United States and of the jurisdiction in which the mortgaged property is located. If the terms of this Agreement conflict with any existing or future law, they shall be deemed modified to the extent necessary to comply with such law. The validity of the remaining terms shall not be affected.

NOTICE: See notice below for important information regarding your rights to dispute billing errors.

BORROWER(S) ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS AGREEMENT

Signature of Borrower: ______________________

Print Name: **Kenneth Farrelly**

Signature of Co-Borrower: Noreen Farrelly

Print Name: **Noreen Farrelly**

**The Borrower is not required to have an attorney. If (s)he does, that attorney should sign below. Signing this certification does not make the attorney a party to the Equity Line Agreement or liable for the debt in any way.**

**The undersigned hereby certifies that (s)he (i) is an attorney at law and (ii) represented the Borrower and any Co-Borrower at the time of the execution of the foregoing Equity Credit Line Agreement.**

**Date:** ____________ **Signature** ______________________

**Print Name** ______________________

---

**YOUR BILLING RIGHTS**
**KEEP THIS NOTICE FOR FUTURE USE**

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us in Case of Errors or Questions About Your Bill**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet of paper at the address listed on the back of your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due. If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill, and we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.
If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

01176.

BK376PG084

EXHIBIT B

# OPEN-END MORTGAGE

(For use in CT, MA, and RI)

| | | | |
|---|---|---|---|
| Maximum Principal Sum:U.S. | $50,000.00 | Borrower(s): | Kenneth Farrelly |
| Maturity Date: | January 9, 2021 | | Noreen Farrelly |
| At the option of the Lender the Maturity Date may | | Property Address: | |
| be extended to | | | 24 Seaside Drive. Jamestown, RI 02835 |

THIS MORTGAGE is between each Mortgagor signing below ("Borrower") and the following Mortgagee ("Lender"):

Name of Lender: **The Washington Trust Company**
Lender's Address for Notices: **23 Broad Street**
**Westerly, Rhode Island 02891**

BORROWER has entered into an Equity Credit Line Agreement ("Agreement") with Lender, dated the same date as this Mortgage, which is a consumer revolving loan agreement that provides for an open-end credit plan (as defined in the Truth in Lending Act). Under the Agreement, Borrower may obtain future advances (including re-advances of any repaid principal) and is indebted to Lender for all amounts advanced and outstanding from time to time. All amounts advanced under the Agreement or this Mortgage, if not sooner paid, are due and payable at the Maturity Date. The maximum principal amount that is or may be secured by this Mortgage at any time and from time to time shall not exceed the Maximum Principal Sum shown above.

TO SECURE to Lender the repayment of the indebtedness evidenced by the Agreement, together with interest thereon, and all renewals, extensions, and conversions of or modifications to the Agreement; the payment of all other sums provided in the Agreement or advanced to protect the security of this Mortgage; and the performance of all other covenants and agreements of Borrower contained herein and in the Agreement, for consideration paid, Borrower hereby mortgages, grants, and conveys to Lender, its successors and assigns forever, with statutory power of sale (if applicable) and with mortgage covenants, the property described in Exhibit A to this Mortgage (the "Property"). This mortgage is given on the STATUTORY CONDITION.

## PROPERTY UNDER MORTGAGE

The Property includes: all improvements erected on the Property; all of Borrower's rights and privileges to all land, water, streets, and roads next to and on all sides of the Property (called "easements, rights, and appurtenances"); all rents from the Property; all proceeds (to the extent necessary to repay the amount Borrower owes) from the Property, including insurance proceeds and proceeds from the taking of all or any part of the Property by a government agency or anyone else authorized by law; and all property and rights described above that Borrower acquires in the future.

## OWNERSHIP OF PROPERTY

Borrower promises that Borrower lawfully owns the property and has the right to mortgage, grant and convey the Property, and that there are no claims or charges (called "encumbrances") against the Property, except for encumbrances disclosed to Lender. Borrower is fully responsible for any losses Lender suffers because someone other than the Borrower has some of the rights in the Property that the Borrower claims, and Borrower will defend Borrower's ownership of the Property against any such claim of rights.

Borrower and Lender covenant and agree as follows:

1 **Payment of Principal, Interest, and Other Charges.** Borrower shall promptly pay, when due, the principal and interest indebtedness secured by this Mortgage and any other charges due under the Agreement.

2 **Application of Payments.** Unless otherwise provided in the Agreement or required by applicable law, all payments received by Lender shall be applied first to billed finance charge, then to other charges that have not been added to principal, then to principal, and finally to unbilled finance charge.

3 **Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien that has priority over this Mortgage, including Borrower's covenants to make payments when due, and will not incur any additional indebtedness under any such mortgage, deed of trust or other security agreement. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property that may attain priority over this Mortgage, and any leasehold payments or ground rents. Borrower will notify all prior mortgagees of Lender's Mortgage.

4 **Hazard and Flood Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require, and in such amounts and for such periods as Lender may require. Borrower shall maintain coverage in an amount equal to the smallest of: (a) the amount of any obligation having priority over this Mortgage, plus the Maximum Principal Sum, or (b) the maximum insurable value of the Property, but in no event shall such amount be less than the amount necessary to satisfy any co-insurance requirement contained in the insurance policy, or (c) such amount as may be required by applicable law. If the Property is located in an area identified by federal officials as having special flood hazards and where flood insurance is available under the National Flood Insurance Act, Borrower will keep Property insured against loss by flood.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender, provided that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgagee clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien that has priority over this Mortgage. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds, at Lender's option, either to restoration or repair of the property or to the sums secured by this Mortgage.

5 **Preservation and Maintenance of Property; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property. If this Mortgage is on a unit in a condominium or planned unit development, Borrower shall perform all of Borrower's obligations under the declaration of covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents. Borrower shall promptly pay, when due, all assessments imposed by the owners' association or other governing body of any condominium project of which the Property is a part, pursuant to the provisions of the declaration, by-laws, regulation or other constituent document of the condominium project. As long as the owner's association or other governing body maintains a "master" or "blanket" policy on the condominium project that provides insurance coverage against fire, hazards

included within the term "extended coverage," and such other hazards as Lender may require, and in such amounts and for such periods as Lender may require, then Borrower's obligation under paragraph 4 to maintain hazard insurance coverage on the Property is deemed satisfied and the provisions of paragraph 4 regarding application of hazard insurance proceeds shall be superseded by any provisions of the declaration. by-laws, regulations or other constituent document of the project or of applicable law to the extent necessary to avoid a conflict between such provisions and the provisions of paragraph 4. For any period of time during which such hazard insurance coverage is not maintained, the immediately preceding sentence shall be deemed to have no force or effect. Borrower shall give Lender prompt notice of any lapse in such hazard insurance coverage. In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss of the Property, whether to the unit or to common elements, any such proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by this Mortgage, with the excess, if any, paid to Borrower.

If the Property is part of a condominium project, Borrower shall not, except after notice to Lender and with Lender's prior written consent, partition or subdivide the Property, or consent to (a) the abandonment or termination of the project, except for abandonment or termination provided by law in the case of a taking by condemnation or eminent domain; (b) any material amendment of the declaration, by laws or regulations of the owners' association or other governing body, or equivalent constituent document of the project, including, but not limited to, any amendment that would change the percentage interests of the unit owners in the project; or (c) the effectuation of any decision by the owners' association or other governing body to terminate professional management and assume self-management of the project.

6 **Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced that materially affects Lender's interest in the Property, the Lender, at Lender's option, on notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as Lender deems necessary to protect its interest. Any amounts disbursed by Lender pursuant to this paragraph 6 shall become additional principal indebtedness of Borrower and Borrower shall pay interest on such amounts at the rate charged on advances under the Agreement. Except to the extent that amounts disbursed by Lender pursuant to this paragraph 6 cause the Borrower's outstanding principal balance to exceed the Maximum Principal Sum, such amounts shall be secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, all amounts disbursed pursuant to this paragraph 6 shall be payable on notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 6 shall require Lender to incur any expense or take any action hereunder, and any action taken by Lender hereunder shall not be a waiver of or preclude the exercise of any of the rights or remedies accorded to Lender.

7 **Inspection**. Lender may make or cause to be made reasonable entries on and inspection of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

8 **Condemnation**. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien that has priority over this Mortgage.

9 **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of any of the other terms of payment of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify the terms of payment of the sums secured by the Mortgage by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by

applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

10 **Successors and Assigns Bound; Joint and Several Liability; Co-Signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to the benefit of, the respective successors and assigns of Lender and Borrower. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Agreement, (a) is co-signing this Mortgage only to mortgage, grant and convey that Borrower's interest in the Property to Lender under the terms of this Mortgage, (b) is not personally obligated to pay the sums secured by this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forebear or make any other accommodations with regard to the terms of this Mortgage and the Agreement without the Borrower's consent and without releasing that Borrower or modifying this Mortgage as to that Borrower's interest in the Property.

11 **Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice required or permitted to be given to Borrower under this Mortgage shall be sent to Borrower by regular mail addressed to Borrower at the address for notices specified in the Agreement; and (b) any notice required or permitted to be given to Lender under this Mortgage (including notices given pursuant to Rhode Island G.L. § 34-25-10(b) and § 34-25-11, if applicable) shall be sent to Lender by regular mail addressed to Lender at Lender's Address for Notices identified at the beginning of this Mortgage. Either party may change its address to which the other party is to send notices by giving the other party notice of the new address in accordance with this paragraph 11. Any notice provided for in this Mortgage shall be in writing and shall be deemed to have been given when mailed, postage prepaid, addressed in the manner designated herein.

12 **Governing Law; Severability**. The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. Notwithstanding the foregoing, nothing herein shall limit the applicability of federal law to this Mortgage. In the event that any provision of this Mortgage or the Agreement conflicts with applicable law, the conflicting provision shall be deemed to be amended to afford the Lender the maximum rights allowed by law. No conflict with applicable law shall affect other provisions of this Mortgage or the Agreement that can be given effect without the conflicting provision and, to this end, the provisions of this Mortgage or the Agreement are declared to be severable.

13 **Borrower's Copy.** Borrower shall be furnished a conformed copy of this Mortgage at the time of execution or after recordation hereof.

14 **Events of Default.** Borrower shall be in default under this Mortgage on the occurrence of any of the following events: (a) failure by Borrower to pay when due any amount owing under the Agreement or this Mortgage if the failure continues for twenty-one (21) days after written notice of the failure is mailed to the Borrower; (b) Borrower makes any fraudulent statement or material misrepresentation in connection with the Agreement or this Mortgage; (c) any action or inaction on Borrower's part adversely affects the Property or the Lender's rights in the Property (e.g., a transfer of title to or sale of an interest in the Property without the Lender's consent; failure to maintain insurance or pay taxes on the Property; action by the Borrower resulting in the filing of a mortgage or lien that is or becomes senior to Lender's Mortgage; action by the Borrower that jeopardizes the Lender's security for future advances; death of all individuals obligated on the Agreement; a taking of the Property by eminent domain; foreclosure by a prior lienholder; or if the Lender's security interest is adversely affected due to (i) waste, destructive use of or Borrower's failure to maintain the Property; (ii) Borrower's illegal use of the Property that subjects it to seizure; (iii) the filing of a judgment against Borrower; (iv) death of one of the joint obligors on the Agreement (except that this event of default shall not apply if the Property is located in Connecticut); or (v) Borrower's moving out of the Property and failing to return within twenty-one (21) days after written notice is mailed to the Borrower).

15 **Acceleration; Remedies.** On default (or, if the Property is located in Connecticut, this Mortgage is subject to one or more prior mortgages, there were loan fees, points, or other prepaid finance charge imposed in

connection with the Agreement, and the default consists of the failure to make a payment, then 39 days after notice of the payment default was given), Lender may declare all sums secured by this Mortgage immediately due and payable, and Lender may invoke any of the remedies permitted under applicable law, including the STATUTORY POWER OF SALE, if any. Lender shall be entitled to collect all reasonable costs and expenses incurred in pursuing the remedies provided in this paragraph 15, including, but not limited to, reasonable attorneys' fees. If Lender invokes a STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to any other person required by applicable law, in the manner provided by applicable law. Lender shall publish the notice of sale and the Property shall be sold in the manner prescribed by applicable law. Lender or Lender's designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order (a) to all reasonable costs and expenses of the sale, including reasonable attorneys' fees and costs of title evidence; (b) to all sums secured by this Mortgage in such order as Lender may determine; and (c) the excess, if any, to the person or persons legally entitled thereto.

16 **Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 15 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable. On acceleration under paragraph 15 hereof or abandonment of the Property, Lender shall be entitled to have a receiver appointed by a court to enter on, take possession of and manage the Property and to collect the rents of the Property, including those past due. All rents collected by the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's fees, premiums on receiver's bonds and reasonable attorney's fees, and then to the sums secured by this Mortgage. The receiver shall be liable to account only for those rents actually received.

17 **Waiver of Homestead; Dower and Curtesy.** When applicable, and as permitted by law, Borrower hereby waives all rights of homestead in the Property and relinquishes all rights of dower and curtesy in the Property.

18 **Release.** Until all amounts secured are paid in full and the Agreement is cancelled, this Mortgage will remain in effect, even though the loan balance may be reduced to zero from time to time. This Mortgage shall be deemed to be satisfied, and Lender shall give Borrower a discharge therefor, when: (a) all sums secured by this Mortgage have been paid in full; and (b) the Lender has no continuing obligation to make additional advances.

**REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST**

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien that has priority over this Mortgage to give notice to Lender, at Lender's address set forth at the beginning of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

**IN WITNESS WHEREOF**, each of the undersigned has executed this Mortgage under seal this 9th day of March, 2001.

| | |
|---|---|
| [signature] Witness to both | [signature] Borrower |
| Print Name Russell W. Hahn | Print Name: Kenneth Farrelly |
| [signature] Witness to both | Noreen Farrelly Borrower |
| Print Name Russell W. Hahn | Print Name: Noreen Farrelly |

STATE/COMMONWEALTH OF Rhode Island
COUNTY OF Washington , ss. Date: 9-Mar-01

Then personally appeared before me Kenneth Farrelly Noreen Farrelly
known by me (or satisfactorily proven) to be the Mortgagor(s) named in the foregoing instrument, and acknowledged the execution of such instrument for the purposes contained therein to be their free act and deed.

[signature]
Notary Public

Print Name [illegible]
My Commission Expires: 11/30/[illegible]

BK 376 PG 090

EXHIBIT A

Those certain lots or parcels of land, with any buildings and improvements thereon, situated in the Town of Jamestown, County of Newport, State of Rhode Island, being located and described as Lot No. 278 and 279 on that plat of land entitled "JAMESTOWN SHORES PLAT NO. 2 IN JAMESTOWN, R.I. OWNED BY JAMES C. HEAD, APRIL 1947 E NEWMAN, ENGINEER", which plat is on file in the Town Clerk's office of the said Town of Jamestown, reference to which is hereby made for a more particular description.

Subject to restrictions and easements of record.

Received for record in Jamestown, R.I.
On May 14 20 01 at 02 H 48 M
[signature] Town Clerk
33.00